# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

TIMOTHY WATTS,                            No. 2:09-CV-1515-KJM-CMK-P

    Plaintiff,

  vs.                                   AMENDED FINDINGS AND
                                            RECOMMENDATIONS
R. RAMOS, et al.,

    Defendants.

_____/

       Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment (Doc. 53).[1]

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] This matter is back before the undersigned following the District Judge's April 1, 2013, order.

1

# I. BACKGROUND

## A. <u>Plaintiff's Allegations</u>

This action proceeds on the original complaint filed June 2, 2009. Plaintiff names the following as defendants: Ramos, Murray, Gibson, Casey, Reid, Thompson, and Prince. He alleges that defendants were deliberately indifferent to a serious medical need, in violation of his rights under the Eighth Amendment. Specifically, he clams that he has a well-documented medical file indicating various and serious medical needs, including "heart and knee concerns." According to plaintiff, his file reveals that, as early as 2006, his medical problems precluded an upper bunk or upper tier cell assignment. He states that documents from 2007 and 2008 confirm this limitation. Plaintiff also states that his "chest pains" are well-documented and preclude him from being subject to any "unreasonable stressful situation."

Plaintiff alleges that, when he attempted to have prison staff follow medical "chronos" for a lower bunk and lower tier cell assignment, he was "ignored, put-off, or told to wait." Specifically, he claims that defendant Murray, who was the "housing sergeant," was aware that he was being housed in an upper bunk on an upper tier "as early as 12/7/06." He states that, on December 8, 2006, he sent defendant Gibson a request for interview, informing him of the situation. While plaintiff states that his request was ignored at first, he was eventually given a lower bunk cell assignment, but remained on the upper tier. Plaintiff states that he next notified defendant Ramos, who is the "housing lieutenant," of the problem. He adds that defendants Murray and Gibson were "always informed of Plaintiff needing a <u>lower-tier</u>, especially due to 'climbing and descending' stairs was 'dangerous and risky' due to his 'knee medical concerns.'" (emphasis in original). According to plaintiff, he informed defendant Thompson via an inmate grievance of his need for a lower tier cell assignment "to no avail."

He claims that defendants Ramos, Murray, Gibson, and Thompson all had "advance knowledge of Plaintiff being housed on the 'upper tier'" and that they all knew of the "risk to a seriously ill inmate, being called 'upstairs.'"

Next, plaintiff alleges that, on June 18, 2008, he experienced chest pains, dizziness, and difficulty breathing. According to plaintiff there is no way for inmates in their cells to communicate with officers in the control towers and that inmates must "yell between a crack in their door, until control tower hears them." When plaintiff began experiencing chest pains on June 18, 2008, he and his cellmate took turns yelling to defendant Reid, who was the officer in the control tower at the time. Plaintiff states that defendant Reid "came to his control tower window" and "partially opened Plaintiff's door" whereupon plaintiff informed defendant Reid that he needed medical attention. Plaintiff alleges that defendant Reid's response was: "Wait until yard release."

When he was eventually released to the yard, plaintiff went to the dayroom "because he felt insecure walking outside in his condition." Plaintiff states that he again asked defendant Reid to summon medical personnel, but that defendant Reid ordered plaintiff to return to his cell. According to plaintiff, another inmate overheard defendant Reid say: "The only way you're leaving this building is in a stretcher." Plaintiff adds that, by 12:30 p.m., he was "yelling for the tower staff to call medical" and that, a short time later, another inmate in the unit "saw no movement" from plaintiff. This inmate then informed defendant Reid of the situation but defendant Reid said that plaintiff would have to wait until the prison nurse arrived on her "pill call rounds." Plaintiff claims that, when the nurse – defendant Prince – arrived, she did not go to the plaintiff's cell. Without further detail, plaintiff alleges that defendant Prince "was aware of Plaintiff's condition and improper cell confinement."

Plaintiff states that, as defendant Prince was making her rounds, defendant Reid opened his cell door. He states that, while descending the stairs from the upper tier in order to obtain medical attention, his knees weakened and he "rolled half-way down the stairs, where he landed on the lower-tier floor – 'unconscious.'" According to plaintiff, it was only then that defendant Reid spoke to defendant Prince to inform her of a "fallen inmate." Plaintiff adds that, even though he was laying unconscious on the floor, "it still took awhile before the alarm was

sounded." Plaintiff claims that inmates who witnessed the situation described defendant Prince's "manner as 'indifferent.'" Additional medical staff eventually arrived and plaintiff was put on a stretcher to be taken to an outside hospital. It was later determined that plaintiff had suffered a heart attack.

Plaintiff claims that defendant Casey was the "floor officer" on June 18, 2008, and that he was aware of plaintiff's medical problem but "failed to get emergency care. . . ." Without stating how defendant Casey was aware of plaintiff's need for a lower tier cell assignment, plaintiff also stated that defendant Casey "did not correct this continuous violation."

**B.    The Parties' Evidence**

Based on their own declarations, plaintiff's deposition testimony, as well as allegations in the complaint, defendants assert that the following facts are undisputed:

1. At all relevant times, plaintiff was an inmate at California State Prison – Sacramento ("CSP-SAC").

2. At all relevant times, defendants Ramos, Murray, Gibson, Thompson, Reid, Prince, and Casey were staff employed at CSP-SAC.

3. Upon arrival at Facility B, Building 5 on December 7, 2006, plaintiff was assigned an upper bunk in a cell located on the upper tier.

4. At that time, there was a shortage of available lower tier lower bunk space due to a large number of inmates with "accommodation chronos" requiring such housing.

5. On January 2, 2007, a comprehensive accommodation chrono was issued for plaintiff which, for unspecified reasons, provided for: a lower bunk and orthopedic shoes for 12 months and a cane for six months.

6. The January 2, 2007, accommodation chrono did not specify a lower tier housing assignment.

7. The chrono was amended by the chief medical officer on May 2, 2007, to provide for a lower tier as well as lower bunk assignment, both for 12 months, due to severe bilateral knee derangement.

8. Despite the amended chrono, plaintiff was not re-housed to a lower bunk in a lower tier cell.

///

4

9. Plaintiff submitted an inmate grievance to defendant Thompson on June 20, 2007, complaining that he had not been re-housed to a lower bunk lower tier cell despite the amended chrono.

10. The accommodation chrono expired on May 2, 2008.

11. At all times plaintiff was housed in Facility B, Building 5 until June 18, 2008, plaintiff ascended and descended the stairs to the upper tier several times a day without incident.

12. On June 18, 2008, plaintiff became dizzy, blacked out, and lost consciousness while descending the stairs from the upper tier.

13. On June 18, 2008, defendant Reid was a tower control officer on Facility B, Building 5 and, as such, was responsible for monitoring the safety and security of the building; in his position in the tower, Reid's access to the building floor was restricted.

14. On June 18, 2008, defendant Casey was assigned as the floor officer.

15. On June 18, 2008, at approximately 11:30 a.m., plaintiff notified defendant Reid that he was experiencing chest pain; in response, defendant Reid contacted the medical clinic and asked if plaintiff could be seen, but was told that staff were preparing for the daily medication pass and that a nurse would attend to plaintiff once rounds were completed.

16. Defendant Prince – a nurse – arrived at approximately 1:00 p.m. to begin distributing medication; Reid notified Prince of plaintiff's concerns.

17. Defendant Prince and another nurse later reported to plaintiff's cell and inquired as to his problem; plaintiff reported chest pains, dizziness, and breathing problems; the nurses then told plaintiff that they would return once they completed their rounds.

19. A short time later, defendant Prince completed her rounds and inquired of plaintiff whether he could walk down the stairs and over to the medical clinic for evaluation; plaintiff responded in the affirmative.

20. Defendant Prince then requested that plaintiff be released from his cell and defendant Reid, who controlled access to and from inmates' cells from the control tower, complied.

21. As plaintiff was descending the stairs to the medical clinic on the ground level, plaintiff became dizzy, blacked out, and struck his chest as he fell the remaining way down the stairs.

22. Immediately after plaintiff fell, defendant Reid yelled to defendant Price to get her attention to the situation; defendant Reid then made an institutional announcement over his radio of a "man down" and he pushed the personal alarm button.

23. Within two to three minutes additional medical and correctional staff responded to the scene and took plaintiff by rolling gurney to the Facility B emergency area, known as Triage Treatment and Assessment ("TTA").

24. At TTA, plaintiff was examined by nurse Swift; plaintiff reported chest pain at 7 out of 10.

25. Plaintiff's vital signs were taken and were all normal except for an elevated pulse; nurse Swift assessed plaintiff with adjustment disorder related to incarceration.

26. An EKG was also performed which revealed signs suggestive a possible acute myocardial infarction.

27. Plaintiff was then transported to an outside hospital for further treatment; by the time he arrived at the hospital his vial signs, including his pulse, were all normal.

28. Plaintiff was kept for observation overnight to rule out myocardial infarction; plaintiff was ultimately diagnosed as suffering from five hours of atypical chest pain, of which plaintiff has a history; plaintiff was discharged with no indications for any specific cardiac treatment.

29. Plaintiff never complained of any musculoskeletal pain or injury resulting from the June 18, 2008, fall.

30. A second accommodation chrono was issued for plaintiff on December 18, 2008, providing for a lower bunk lower tier cell assignment for 12 months.

Attached to his opposition, plaintiff provides the declarations of several inmates who were witnesses to the events of June 18, 2008. Inmate Coleman states that he was housed in Facility B, Building 5 on June 18, 2008. He states that, on that day, he "clearly saw and heard C/O Reid yell back 'the only way you're leaving this building is in a stretcher.'" Mr. Coleman adds that, while he heard plaintiff "ask the officer to call medical," he "did not see C/O Reid get on the phone." Inmate Jackson also states that he was housed in Facility B, Building 5 on June 18, 2008. Mr. Jackson states that, after plaintiff fell, "it took awhile before the alarm was sounded." Inmate Cole, who was also housed in Facility B, Building 5 on June 18, 2008, states that defendant Reid "took his time to respond to the man down call."

/ / /

/ / /

Based on the evidence presented, the court explicitly finds that the facts numbered above are undisputed and that, at best, plaintiff's evidence suggests a possible delay in providing medical treatment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The

opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

        In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

/ / /

/ / /

/ / /

### III. DISCUSSION

Defendants argue that plaintiff cannot prevail because the undisputed evidence establishes that they were not deliberately indifferent to any serious medical need. They also argue that they were not deliberately indifferent to any risk of harm posed by plaintiff being housed in an upper tier cell. Additionally, Defendant Thompson argues that he cannot be held liable because his only involvement in plaintiff's case was to review his inmate grievance.

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

**A.    Safety**

Under the general principles outlined above, prison officials have a duty to take reasonable steps to protect inmates from physical abuse. See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir. 1982); Farmer, 511 U.S. at 833. Liability exists only when two requirements are met: (1) objectively, the prisoner was incarcerated under conditions presenting a substantial risk of serious harm; and (2) subjectively, prison officials knew of and disregarded the risk. See

9

Farmer, 511 U.S. at 837. The very obviousness of the risk may suffice to establish the knowledge element. See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995). Prison officials are not liable, however, if evidence is presented that they lacked knowledge of a safety risk. See Farmer, 511 U.S. at 844. The knowledge element does not require that the plaintiff prove that prison officials know for a certainty that the inmate's safety is in danger, but it requires proof of more than a mere suspicion of danger. See Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986). Finally, the plaintiff must show that prison officials disregarded a risk. Thus, where prison officials actually knew of a substantial risk, they are not liable if they took reasonable steps to respond to the risk, even if harm ultimately was not averted. See Farmer, 511 U.S. at 844.

In this case, the court explicitly finds that the following facts are undisputed: when plaintiff fell on June 18, 2008, he did not have a current accommodation chrono for a lower tier lower bunk cell assignment. Specifically, it is undisputed that the January 2, 2007, chrono, amended on May 2, 2007, provided for a 12-month accommodation period, expiring on May 2, 2008. It is also undisputed that no accommodation chrono was issued again for plaintiff until December 18, 2008. Thus, at the time of plaintiff's fall in June 2008 no chrono was in place and, as a result, defendants could not have known of a risk posed by an upper tier cell assignment.[2] Because the undisputed evidence does not establish any apparent risk to plaintiff's safety posed by an upper tier cell assignment during the lapse period when plaintiff fell, defendants cannot have been deliberately indifferent.

///

**B.   Medical Needs**

---

[2] To the extent plaintiff argues that, during the lapse period, the risk must have been obvious because it existed before and after the lapse period, as demonstrated by the chronos, such an argument is not supported by the evidence. In particular, the undisputed evidence shows that the first chrono was issued for unspecified reasons and contained an expiration date. Likewise, the undisputed evidence shows that the second chrono also contained an expiration date. Thus, on the face of the chronos, plaintiff's need for accommodation was temporary and, when the chronos expired, so did the need.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989).  The complete denial of medical attention may constitute deliberate indifference.  See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

In this case, plaintiff claims that defendants were deliberately indifferent to his medical needs leading to and following his fall on June 18, 2008.  Specifically, plaintiff claims that defendants Reid and Casey failed to summon emergency care for over an hour while he was experiencing chest pains in his cell.  He further alleges that defendant Prince was slow in her response after he fell.

1        The undisputed evidence does not bear out plaintiff's allegations.  The court
2   explicitly finds the following facts to be undisputed: plaintiff first reported chest pains at 11:30
3   a..m. and defendant Reid responded by contacting the medical clinic.  Thus, contrary to
4   plaintiff's allegations that defendant Reid, did nothing, the undisputed evidence shows that he in
5   fact was deliberate in the initial attention given to plaintiff's complaints.  It is also undisputed
6   that, an hour-and-a-half later at 1:30 p.m., defendant Prince, a prison nurse, was notified by
7   defendant Reid of plaintiff's complaints.  The undisputed evidence shows that, a short time later,
8   defendant Prince reported to plaintiff's cell to discuss his complaints whereupon plaintiff
9   informed defendant Prince that he could walk down the stairs to the medical clinic for evaluation.
10  The undisputed evidence further shows that, after plaintiff fell, defendants promptly responded
11  and plaintiff was taken to the TTA area.   At best, plaintiff's evidence in response to defendants'
12  motion suggests there may have been some delay in providing medical care.  As defendants note
13  and the undisputed evidence shows, however, plaintiff did not sustain any additional injuries as a
14  result of any alleged delay.  In particular, it is undisputed that plaintiff's EKG and vital signs
15  were normal, and he reported no injuries resulting from the fall.
16  / / /
17  / / /
18  / / /
19  / / /
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Doc. 53) be granted.

These amended findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 20, 2013

                                                          **CRAIG M. KELLISON**
                                                        UNITED STATES MAGISTRATE JUDGE